Charles H. Cohen v. Commissioner. Harold Cohen v. Commissioner.
Charles H. Cohen v. Commissioner
Docket Nos. 12898, 12899.
United States Tax Court
1948 Tax Ct. Memo LEXIS 85; 7 T.C.M. (CCH) 681; T.C.M. (RIA) 48186; September 29, 1948
*85 On the record, it is held that a valid partnership for Federal income tax purposes existed between petitioners and their wives during the taxable years, and the wives of the petitioners are each taxable under the partnership agreement upon one-sixth of the earnings of the partnership. It is further held that an expenditure by the partnership in 1943 for repainting on the outside of its building is deductible as a business expense, and that a liability incurred in that year by the partnership for an architect's services in connection with a contemplated addition to its building is not shown to be allowable as a deduction for that year. Thomas McE. Johnston, Esq., and R. B. Cole, Esq., for the petitioners. Bernard D. Hathcock, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: These proceedings were consolidated for hearing and decision. They involve, in the case of Harold Cohen, a deficiency in income tax of $25,441.87, and in the case of Charles H. Cohen, a deficiency in income tax of $26,003.52 for the fiscal year ended September 30, 1944. The deficiencies arise in major part through the action of respondent in including *86 in the petitioners' income partnership income distributable to their respective wives for the fiscal years ended September 30, 1943 and September 30, 1944. The computation of income for the fiscal year 1943 is necessary by reason of the application of the Current Tax Payment Act. The proceeding also involves adjustments by respondent in partnership income in the disallowance, as deductible expense, of an architect's fee of $200 and the cost of painting in the amount of $185. Findings of Fact The petitioners are brothers and both are residents of Miami, Florida. Their returns for the period here involved were duly filed with the collector of internal revenue at Jacksonville, Florida. The Ward Distributing Company is a partnership which operates as a wholesale beer distributor, with its main office in Miami, Florida, and branches in Key West and Fort Myers, Florida. The partnership commenced business on October 1, 1942, under a verbal agreement of partnership which was later, on September 19, 1945, confirmed by an agreement in writing effective as of October 1, 1942. The partnership books opened for the business in 1942 recorded partnership interests of one-third in each of the *87 petitioners, Harold and Charles H. Cohen, and a one-sixth partnership interest in each of their respective wives, Ethel and Mary Cohen. In 1933, the petitioner, Harold Cohen, had organized a company known as the Maine Growers Exchange. The money invested in this business was $2,000 belonging to his wife, Ethel Cohen, who had received it as a wedding gift from her mother and father. Shortly after organizing this business this petitioner became ill and his wife operated the business personally during the long period in which he was confined to the hospital. Upon his recovery in 1934 and return to business, he was joined in the business of the Maine Growers Exchange by the petitioner, his brother Charles Cohen, who invested therein $2,000 in cash and an automobile truck. The business of the Maine Growers Exchange was not successful and the two petitioners liquidated it and with the proceeds of that liquidation acquired each a one-third interest in a corporation known as the Ward Distributing Company. The other one-third interest in such corporation was owned by one Jack Ward. The operation of the Ward Distributing Company was not successful, due in large measure to the conduct *88 of Ward who was in charge of cash and inventory, and a shortage developed of some $18,000, which left the corporation barely solvent. Under these conditions it was realized by the petitioners that they could not proceed unless the interest of Ward in the business was bought out, and an agreement was finally secured from him to sell his interest for $5,000 and a Chrysler automobile. Petitioners, under these conditions, conferred with their wives and the four of them called by long distance a brother of the petitioners, Joseph H. Cone, a manufacturer of Bridgeport, Connecticut, and a man of considerable means. They explained to him the situation and he agreed to furnish the $5,000 necessary to acquire the Ward interest but only upon the condition that petitioners' two wives not only participate actively in the management of the business but also have a financial interest therein. He talked to the petitioners' wives and a definite understanding to this effect was reached with them. The petitioners' wives were women of business training and experience. Following this, Joseph H. Cone forwarded his check for $5,000, made payable to one of the petitioners, and with the proceeds of this *89 check the stock of Jack Ward in the corporation was acquired. In this transaction the petitioners did not disclose to Ward the fact that their wives were acquiring his interest in the corporation as there had been some friction between the wives and Ward. The latter was drinking at the time and it was feared by the petitioners that if the arrangement contemplated by them was known to him he might refuse to carry, out his agreement to sell his stock. Under these conditions the transfer of the stock by Ward was made to the two petitioners, they receiving the stock with the understanding that they held title for their wives. This transaction was carried out in February 1942 and, upon its being consummated, agreement was made between petitioners and their wives that the corporation would be liquidated and a partnership created in which petitioners would hold each a one-third share and their wives each a one-sixth share, the partnership to take over the liquidated assets of the corporation. In accordance with the advice of the accounting firm representing the corporation, the liquidation of the latter was postponed until the close of its fiscal year on September 30, 1942. On that date *90 the corporation was liquidated. From February 1942 until the date of liquidation, the petitioners' wives participated actively in the management of its affairs, devoting all of their time to the business, and were in complete charge of the cash, accounting and inventory. The work done by petitioners for the corporation during this period was limited to the buying and distributing of beer. The partnership, upon organization on October 1, 1942, opened its bank account showing petitioners and their wives as the partners. Application was made and a certificate received under the Fictitious Names Act of Florida showing the business to be a partnership owned by petitioners and their wives, and advertisement of the fact of the partnership by these four individuals was published in a local newspaper. There were also secured the necessary Federal and State licenses to carry on a beer distributing company, these being issued to the four individuals as partners, and the wives secured decrees of court under the law of Florida declaring them to be "free traders". From the time of the acquisition of the Jack Ward stock in the preceding corporation the petitioners and their wives worked continuously *91 in the business but drew no salaries. On the liquidation of that corporation there was paid to each of the petitioners, $6,800 as back salary, and to each of their wives, $925.65 as back salary. These amounts were paid by each of the four individuals into the partnership and constituted its cash balance upon opening. The other assets of the partnership received at that time were the remaining assets of the corporation, representing the going business, inventory, equipment, trucks, etc. Sometime prior to the liquidation of the corporation, the one-third of its stock acquired from Jack Ward, as heretofore detailed, was transferred by the petitioners in equal proportions to their wives. It was the understanding of these four parties, as well as the understanding of Joseph H. Cone, that the $5,000 transmitted by him was to be used for the acquisition of a financial interest in the partnership by the petitioners' two wives. Following the organization of the partnership in October 1942, the situation became critical in the market upon which the partnership had to secure its beer for distribution. It represented three manufacturers and from these not enough beer could be secured for it *92 to operate profitably. This country was at war and many of the facilities of the brewing companies were being used to produce alcohol for war purposes and the supply of beer had decreased to a very large extent. Faced with this condition, the two petitioners left the entire control of the business at Miami to their wives and traveled extensively in the east and middle west in attempts to buy beer from various breweries. In some cases breweries had beer but no bottles in which to ship it and the petitioners managed to secure bottles and cases for the breweries and in this way secured the needed shipments of beer. They were away for long intervals and during this time the entire management of affairs at Miami devolved upon their wives. The duties formerly performed by petitioners of supervising the receipt and distribution of the beer were taken over by their wives in addition to their regular duties which consisted of handling all cash, keeping the inventories and supervising the warehouse foremen, checking and verifying these inventories, making all bank deposits, paying all bills and keeping all personnel records and payrolls. Their work, during the absence of their husbands, required *93 them to be at the office at 7:30 in the morning and to work at times until 9:00 and 10:00 o'clock at night. During the times when their husbands were in the city they accompanied them to the office in the morning and returned home with them at night. Through the efforts of the petitioners and the efforts of their wives the business began to improve. Sales increased tremendously although there was a very small increase in overhead expense. The breweries which the partnership represented, as distributors, increased from three to 18. After petitioners' wives took entire charge of the handling of the cash and the accounting for the inventory, and checked the beer charged out of the warehouse against the receipts brought in by the employees from deliveries, there were no shortages as during the former administration of Jack Ward. The only shortages under their administration were trifling ones in the account of some truck driver, which were picked up on checking his cash with the beer delivered to him and which were thereupon charged back and deducted from his pay. Following the organization of the partnership on October 1, 1942, one-third of the income thereof was credited to each *94 of the petitioners and one-sixth to each of their wives. In making the payment of $5,000 for the purpose of acquiring the Jack Ward stock in the former corporation, Joseph H. Cone asked for no note or other evidence of indebtedness. No entry was made on the books of the partnership of an indebtedness on its part to him and no repayment of this amount has been made to Cone or requested by him. His reply to inquiries as to any repayment was that he "wished it forgotten". One factor contributing largely to the success of the partnership following its organization has been large loans made by Cone to it, sometimes running as high as $100,000, and his personal guarantee of many of the large accounts of the partnership. The knowledge by Cone that he would be called on in the future to finance the partnership in many of its operations to make it successful was one of the main reasons for the condition laid down by him upon the acquisition of the Jack Ward stock that petitioners' wives not only take an active part in the business but also own a financial interest therein. In the formation of the partnership between petitioners and their wives on October 1, 1942, it was their bona fide intention *95 to carry on a partnership business composed of and operated by these four individuals. To the partnership so formed petitioners' wives have contributed substantial capital, originating with them, and have at all times performed vital and necessary services and have participated actively in the control and management of the business. During the fiscal year ended September 30, 1943, the partnership incurred an obligation of $200 for architectural work on a contemplated addition to its building. The construction of this addition was abandoned and the partnership moved to a different building. On September 7, 1943, the partnership paid $185 for some repainting on the outside of its building. Opinion That a valid partnership may exist without a written contract if it be definitely established that a verbal agreement was entered into and followed by the parties is a well established rule and has been followed by us. Reuben Stiefel, 9 T.C. 576, and Francis A. Parker, 6 T.C. 974. Under the facts here disclosed we can not attach weight to the argument by the respondent that a written contract was not entered into by the parties until a date subsequent to that *96 on which the business began operation tends to show that prior to the execution of the written contract no partnership between the petitioners and their wives existed. Here the facts established and found by us are convincing that the petitioners and their wives, prior to October 1, 1942, entered into an agreement to dissolve the corporation, the stock of which was owned by the four of them, and contribute the liquidated assets thereof to a partnership to be carried on by these four parties, with interests of one-third in each of the petitioners and interests of one-sixth in each of their wives. This agreement is shown to have been carried out and the partnership created on that date by the transfer to it of funds originating with the wives as well as petitioners and with the assets of the corporation, one-third of the stock of which was owned by the wives. The evidence is convincing that the business was operated from that date forward by the four individuals as a partnership. Immediately following this date they advertised the organization of the partnership in a local paper, opened a bank account in the name of the partnership, holding themselves out as partners, and secured the *97 issuance of State and Federal licenses for the carrying on of the business by the four individuals in partnership. They also applied for and received a license to do business under the Fictitious Names Act in the State of Florida. In Commissioner v. Tower, 327 U.S. 280, and Lusthaus v. Commissioner, 327 U.S. 293, the Supreme Court laid down the test for determining whether a valid partnership for tax purposes actually exists under agreement between husband and wife. In the first cited case, the court said: "II. There can be no question that a wife and husband may, under certain circumstances, become partners for tax, as for other purposes. If she either invests capital originating with her or substantially contributes to the control and management of the business, or otherwise performs vital additional services, or does all of these things, she may be a partner as contemplated by 26 U.S.C. §§ 181, 182. * * *" In the present case it is clearly shown that the wives of these petitioners made substantial contributions, originating with them, to the capital of the partnership, that they performed vital and essential services to the *98 business and participated actively in its control and management to an extent similar to the participation therein on the part of their respective husbands. It is established to our satisfaction that the administrative duties performed by them without direction or control were as much responsible for the success of the business as the services performed therein by their respective husbands. We accordingly hold that a bona fide partnership existed between petitioners and their wives at all times subsequent to October 1, 1942, and that in the fiscal years ended September 30, 1943 and September 30, 1944 the wives of petitioners were each taxable upon one-sixth of the income realized. Respondent has disallowed for the fiscal year 1943 an item of $185, representing the cost of some repainting done on the outside of the building occupied by the partnership. The facts do not show whether this building was owned or rented by the business, but in either event the item appears not to be capital in character but merely a normal expense of maintenance and allowable as an expense of operation. Respondent also disallowed a deduction of $200, representing an obligation shown to have been incurred *99 in 1943 for architectural work on a contemplated addition to the building. This action was taken upon the ground that this was a capital expenditure. There is no doubt that the architect's fee would be a capital expenditure as part of the cost of the additional construction and, consequently, it should have been treated as a capital item. Petitioners contend, however, that plans for the addition were abandoned and the business moved to another location. If this abandonment and move occurred during the year 1943, the cost of architect's plans would have constituted a loss deductible for that year. The record, however, is silent as to when the plans were abandoned and the move occurred. For all we are advised, this may have been in a year subsequent to 1943 and, consequently, petitioners have not shown this item to be a proper deduction for the year in question. Decision will be entered under Rule 50.